2002 ME 43

**Ruth RICE**

v.

**Lynda ALLEY**

Supreme Judicial Court of Maine.

Submitted on briefs: Jan. 17, 2002.
Decided: March 22, 2002.

Joel A. Dearborn Sr., Esq., Brewer, for plaintiff.

Christopher J. Whalley, Esq., Ellsworth, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Defendant Lynda Alley (f/k/a Lynda Spreng) appeals from a judgment of the District Court (Ellsworth, *Mills, J.*) awarding Ruth Rice $20,000 in compensatory damages in her action for defamation. Alley challenges the judgment on numerous grounds. We agree with Alley's contention that her statements were conditionally privileged, and that Rice presented insufficient evidence to show that the privilege was abused. Accordingly, we vacate the District Court's judgment.

[¶ 2] In the early 1990s, Rice's husband, William Rice, became a member of the Ellsworth Lodge Number 2743 of the Benevolent and Protective Order of Elks, a nonprofit fraternal organization, and Rice joined the Ladies Auxiliary, which operated under the sponsorship of the Lodge.

[¶ 3] The Lodge conducted bingo games to raise money. Upon entering the lodge to play bingo, a player would purchase bingo cards for the evening. The player could purchase cards for the "regular" bingo game, the "bonanza" game, and the "early bird" game. The player would receive a receipt that showed the number of cards purchased for the various games. The receipt was a two-part, carbonless-copy receipt. One copy was given to the player and the other copy was kept on file by the Lodge.

[¶ 4] The bonanza bingo game was unique. A player would review and compare the bonanza cards he or she purchased to pre-posted letters and numbers on the bingo board. If not satisfied with the bonanza cards initially purchased, the player could purchase additional bonanza cards. A receipt evidencing the additional purchase was not usually made out.

[¶ 5] On bingo nights, the Lodge offered a 50-50 raffle with door prizes to players. One of the prizes was a free night of bingo. This prize entitled the winner to receive without cost, for use at the Lodge's *next* bingo night, the same number and type of games purchased on the night of the raffle, as indicated on the entry receipt. The receipt would be annotated with the term "free cards" and signed by a Bingo Committee member. Only Bingo Committee members could validate raffle winners' receipts.

[¶ 6] Rice regularly attended bingo games held at the lodge. She also assisted in the operation of the games as an Auxiliary member of the Bingo Committee until 1993, when the Lodge adopted a rule that prohibited members of the Auxiliary from working at the bingo games if they were also going to participate as a player.

[¶ 7] On March 31, 1994, Rice attended bingo night. She purchased thirty-one playing cards; fifteen regular, ten early bird, and six bonanza. She obtained a receipt from a member of the Bingo Committee that evidenced this purchase. Rice, dissatisfied with the bonanza cards she originally bought, purchased four additional bonanza cards. She modified her receipt to reflect the additional purchase without notifying any member of the Bingo Committee. Rice won the 50–50 raffle

that evening, entitling her to free cards for the next scheduled bingo night.

[¶ 8] On April 20, 1994, Rice again attended the Lodge's bingo game. She initially purchased fifteen regular cards, ten early bird cards, and four bonanza cards. She purchased ten additional bonanza cards and revised her entry receipt to reflect the additional purchase. Rice won the 50–50 raffle again, entitling her to free cards at the next bingo night.

[¶ 9] On April 21, 1994, Rice presented her receipt from the night before for the purpose of getting the free cards. Robert Sargent, the Chairman of the Bingo Committee, looked at Rice's receipt, compared the Lodge's file copy of the receipt to Rice's copy, and asked her about the alteration. Rice explained that she had altered the receipt to reflect the additional bonanza cards she had purchased. Sargent told Rice that she was not authorized to alter receipts and provided her with only the number of cards originally purchased as evidenced by the Lodge's copy on file.

[¶ 10] Sargent then reviewed all the receipts for the last three months to see if any other alterations had been made. The only other instance of alteration he found by anyone was the alteration made by Rice on her March 31 receipt. Sargent informed the members of the Bingo Committee of the incident. On July 31, 1994, at the request of the Committee, Sargent consulted with the Maine State Police Gaming Commission about what recourse the Lodge might take.

[¶ 11] During the first week of May of 1994, Sargent informed Alley and various members of the Auxiliary that Rice had altered her receipt on two occasions. The Auxiliary members agreed to present the issue at their next meeting scheduled for May 9, 1994.

[¶ 12] Rice was the President Elect of the Auxiliary and slated to become the President. She did not attend the May 9 meeting, however, because she was ill. Sargent did attend the meeting. He explained Rice's receipt alterations to the group and answered questions by the members. He then left the meeting because of the Auxiliary's confidentiality and members only requirements.

[¶ 13] The Auxiliary voted to request that Rice resign as President due to "inappropriate actions befitting an officer of the Ladies Auxiliary." Everyone present signed a letter explaining their decision. The letter was mailed to Rice.

[¶ 14] In response to the letter, Rice retained an attorney. Her attorney sent a letter, dated May 24, 1994, to the Auxiliary, threatening litigation if a "full description" of all the allegations was not received by June 1, 1994.

[¶ 15] The Auxiliary informed the leadership of the Elks Lodge about the letter. On the advice of the Lodge leadership, the Secretary of the Auxiliary sent Rice's attorney a letter requesting an extension of the June 1 deadline to June 16. The letter also stated that "Rice may appear [at the next scheduled meeting] to hear the allegations of inappropriate behavior and reply. Perhaps this matter could be handled within [the Auxiliary's] own organization."

[¶ 16] The Auxiliary scheduled a special meeting to discuss the issue for June 7, 1994. Rice went to the meeting with her attorney. The members of the Auxiliary requested that her attorney leave the meeting due to the confidentiality and members-only requirements governing all Auxiliary meetings. Rice refused to stay without the presence of her attorney and, along with her attorney, left the meeting.

[¶ 17] After Rice left the meeting, Rice's altered receipts were again discussed. Alley stated that Rice's actions in altering the receipts were intentional, dishonest, and illegal. The Auxiliary voted to remove

Rice as President and notified her by a letter signed by the Secretary and mailed to Rice.

[¶ 18] Within a matter of days, on June 13, 1994, Rice brought a Complaint alleging that she was defamed by numerous defendants, including Sargent and Alley, Sharon Piper, Vicki Lewis, Donna Scott, Mary Astbury, Alice Jordan, Evelyn Hardison, and Patricia Buteau.[1] Sargent died before trial, and all claims against him were dismissed. Following a trial, the District Court entered a judgment in favor of all the remaining defendants, except Alley. The court found that Alley's statements at the June 7, 1994, Ladies Auxiliary meeting constituted defamation per se and assessed damages at $20,000. Alley then filed this appeal.

[¶ 19] Defamation consists of:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991).

[¶ 20] Alley contends that her statements at the June 7, 1994, Ladies Auxiliary meeting were conditionally privileged and that she did not abuse the privilege. Rice contends that Alley's statements were unprivileged because Maine law does not recognize a privilege "for fraternal organizations or their affiliates." We agree with Alley.

[¶ 21] "One who publishes defamatory matter concerning another is not liable for the publication if (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused." RESTATEMENT (SECOND) TORTS § 593 (1976). Whether a defendant is entitled to the common law conditional privilege is a question of law; whether the defendant abused the privilege is a question of fact. *Cole v. Chandler*, 2000 ME 104, ¶¶ 6–7, 752 A.2d 1189, 1193–94.

[¶ 22] "A conditional privilege against liability for defamation arises in settings where society has an interest in promoting free, but not absolutely unfettered speech." *Lester*, 596 A.2d at 69. A conditional privilege "may arise in any situation in which an important interest of the recipient of a defamatory statement will be advanced by frank communication." *Cole*, ¶ 6, 752 A.2d at 1193 (quoting *Rippett v. Bemis*, 672 A.2d 82, 87 (Me.1996)).

Conditional privilege is based upon the circumstances of "the occasion upon which the defendant published defamatory matter," and we use the *Restatement* approach when determining the existence of such circumstances.

The *Restatement* does not prescribe a list of particular settings to which conditional privileges are restricted. Instead, it uses a weighing approach based on the totality of the circumstances, in view of the interests of the publisher and the recipient. Any situation in which an important interest of the recipient will be furthered by frank communication may give rise to a conditional privilege.

*Lester*, 596 A.2d at 70. *See also* RESTATEMENT (SECOND) TORTS § 594 ("An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher,

---

1. All of the defendants except Sargent were members of the Auxiliary.

and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.").

[¶ 23] "If a conditional privilege exists, liability for defamation attaches only if the person who made the defamatory statements loses the privilege through abusing it." *Lester*, 596 A.2d at 69. "Abuse includes making the statement outside normal channels or with malicious intent. For purposes of defamation claims, malice means when the originator of the statement knows [her] statement to be false, recklessly disregards its truth or falsity, or acts with spite or ill will." *Cole*, ¶ 6, 752 A.2d at 1194. An inadequate investigation of the truth of the statement by the publisher is not sufficient to show actual malice. *Id.*

[¶ 24] A comparison of the benefits to the Auxiliary and its members if the substance of Alley's statements was accurate with the harm that would be done to Rice's reputation if the statements were proved to be inaccurate persuades us that the statements were privileged. The members of the Auxiliary have a common interest in ensuring the integrity of the organization, its officers, and the honesty of their fund raising activities. They have a substantial interest in ensuring that one of their own members is not stealing from the Elks Lodge. If the statements were true, then Rice, who was scheduled to become President of the Auxiliary, was stealing from the organization. If the statements were false, then the members of the Auxiliary would wrongly believe for a limited amount of time that Rice abused the bingo system by improperly procuring bonanza cards. The Auxiliary's interests in preventing abuse of the bingo games by one of its own members is substantial, and Rice had voluntarily sought a leadership position with the organization.

[¶ 25] Moreover, the Ladies Auxiliary did not intend to act on Alley's statements at the June 7 meeting until after investigating the truth of the statements by speaking with Rice directly. Despite knowing that false allegations were being made, Rice voluntarily left the meeting and refused to explain her actions. It is not surprising that the members of the Auxiliary assumed that Alley's statements were true and took the action they did. We are satisfied that Alley's statements were conditionally privileged.

[¶ 26] Having determined that Alley's statements were made in a privileged context, we must examine the record to determine if there is sufficient evidence that the privilege was abused. Rice has the burden of producing evidence of abuse, *Cole*, ¶ 6, 752 A.2d at 1194, and our review of the record leads us to conclude that there is insufficient evidence suggesting that Alley abused the privilege.

[¶ 27] Alley's comments were made exclusively to members of the Auxiliary within the confines of confidential Auxiliary proceedings, and were not repeated outside of the confidential June 7 meeting. Only Rice's commencement of litigation has kept this topic alive in any venue.

[¶ 28] Furthermore, Alley relied on the reports of Sargent, the Chairman of the Bingo Committee, who described Rice's actions as improper and unlawful. That reliance was not reckless. Sargent, as the Chairman of the Bingo Committee, was charged with ensuring the integrity of the Lodge's bingo games. His investigation included a review to detect irregularities of the receipts for the three months prior to April 20, 1994. He sought the advice of the entire Bingo Committee before acting. Sargent also discussed the issue with the Maine State Police and acted on their specific advice. Based on these facts, Alley did not abuse the conditional privilege.

[¶ 29] Because we find that Alley's statements were conditionally privileged and

that she did not abuse the privilege, it is unnecessary to discuss Alley's other contentions.

The entry is:

Judgment vacated. Remanded for the entry of a judgment in favor of Alley.