STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-11-67

THOMAS THOMSEN,

Plaintiff,

v.                                                              ORDER

STATE OF MAINE
Cumberland, ss, Clerk's Office

OCT 2 5 2013

RECEIVED

LARRY CHANEY, et al,

Defendants

Before the court is a motion for summary judgment by defendants William Darling and Maine Roofing Inc.

In this action plaintiff Thomas Thomsen has sued William Darling and Maine Roofing for malicious prosecution and defamation. William Darling is a shareholder and the principal officer of Maine Roofing. Thomsen alleges that both Darling personally and his wife Liz, who was an employee of Maine Roofing, engaged in the conduct that forms the basis for Thomsen's claims of malicious prosecution and defamation. Because Thomsen's claims focus solely on William and Liz Darling, defendants Darling and Maine Roofing will be referred to collectively in this order as the Darlings.

Specifically, Thomsen contends that the Darlings wrongfully instigated a criminal prosecution against him for the alleged theft of certain trucks, charges that were subsequently dismissed. Thomsen also alleges that the Darlings made certain defamatory statements to the effect that Thomsen was a thief who had stolen the trucks and that those statements were made to persons other than law enforcement officers.

The other original defendant in the case, Larry Chaney, filed a bankruptcy petition after the action was commenced, and plaintiff has since advised the court that his claims against Chaney have been settled. Plaintiff's Memorandum in Opposition to Summary Judgment dated June 7, 2013 at 1 n.1.

Summary Judgment

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. E.g., Johnson v. McNeil, 2002 ME 99 ¶ 8, 800 A.2d 702. The facts must be considered in the light most favorable to the non-moving party. Id. Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. Rodrigue v. Rodrigue, 1997 ME 99 ¶ 8, 694 A.2d 924.

In some respects, the submissions filed on the instant motion are the kind of submissions that give summary judgment a bad name. Plaintiff responded to defendants' eight page, 40-paragraph statement of material facts (SMF) with 12 pages of denials, qualifications, and admissions and simultaneously filed a Statement of Additional Material Facts (SAMF) consisting of 25 pages and 182 numbered paragraphs. Defendants required 43 pages to respond to that submission in their Reply SMF, and plaintiff then filed a Rule 56(i)(2) response to the Reply SMF consisting of 63 additional pages, not including attachments.

2

It is doubtful that submissions totaling 151 pages constitute "short and concise" statements as required by Rule 56(h)(1)-(3). Trying to sort through all this material places a distinct burden on the court, a burden which is not made easier by the repetitive nature of some of the factual assertions in plaintiff's SAMF. See, e.g., Thomsen SAMF ¶¶ 129-31, 162, 175 (essentially repeating Thomsen SAMF ¶¶ 57, 53, 138, 140, and 135). However, the court has attempted to undertake the necessary review in this case because the primary offender is the plaintiff, and it would be unfair to deny summary judgment just because the party opposing the motion has inundated the record with factual assertions.[1]

Some of the problems with the plaintiff's submissions are not just quantitative but qualitative. For instance, in support of his contention that there are factual disputes for trial, plaintiff also repeatedly relies on unauthenticated documents, including police reports, without offering any foundation for their admissibility. See, e.g., Thomsen SAMF ¶¶ 72-78. Rule 56(e) requires that a party opposing summary judgment set forth "such facts as would be admissible in evidence." It is insufficient to argue that police reports would be "potentially" admissible under M.R.Evid 801 as a prior statement of a witness and admissible as a business record[2] when the document itself is hearsay and police reports are expressly declared to be inadmissible under M.R.Evid. 803(8)(B)(i).

However, after defendants objected to factual assertions supported by inadmissible police reports, Thomsen attached deposition testimony to his Rule 56(i)(2)

_____

[1] In Stanley v. Hancock County Commissioners, 2004 ME 157 ¶ 29, 864 A.2d 169, the Law Court stated that a motion for summary judgment may be denied if the movant submits an unnecessarily long, repetitive, or otherwise convoluted statement of material facts. There is no comparable authority that a motion for summary judgment may be granted if the party opposing summary judgment submits an unnecessarily long, repetitive, or otherwise convoluted statement of material facts.

[2] See, e.g., Plaintiff's Rule 56(i)(2) response to defendants' Reply SMF ¶ 72.

response that provides an evidentiary foundation for the information in certain of the police reports and other documents upon which he relies. This is not the way summary judgment is supposed to work.[3] However, rather than relying on technical inadequacies in Thomsen's opposition papers, the court will consider the substance of the information submitted by Thomsen in determining whether he has demonstrated the existence of genuine issues for trial.

The facts cited below are drawn from the factual assertions in Defendants' SMF and Thomsen's SAMF that are either admitted or are subject to denials or qualifications that are not supported by the record citations provided. On issues where there is a dispute between the version of the facts offered by Thomsen and the version offered by defendants, the court has assumed that the version in Thomsen's SAMF, deposition, or affidavit is correct for purposes of summary judgment.

Thomsen's Claim of Malicious Prosecution

To prevail on his claim of malicious prosecution against Darling and Maine Roofing, Thomsen must prove (1) that Darling and Maine Roofing initiated, procured, or continued a criminal case without probable cause; (2) that Darling and Maine Roofing acted with malice; and (3) that Thomsen received a favorable termination of the proceedings. Trask v. Devlin, 2002 ME 10 ¶ 11, 788 A.2d 179.

There is no dispute in this case that there was a criminal investigation that focused on Thomsen, that he was indicted for a felony theft, and that he received a favorable termination when the indictment was dismissed. It does not appear to be

---

[3] A party opposing summary judgment is required to provide record support for its factual assertions in its opposing statement of material facts or in its statement of additional material facts. M.R.Civ.P. 56(h)(2). A party opposing summary judgment should not be allowed to wait to provide record references supporting its opposition to the motion until after the movant no longer has an opportunity to respond.

4

disputed that the Darlings played a major role in initiating the criminal prosecution. The Darlings argue, however, that the summary judgment record demonstrates that they had probable cause.

The undisputed evidence on this issue is that Maine Roofing had obtained a judgment against CLRS Enterprises, a company owned by Larry Chaney. Defendants' SMF ¶ 10; Thomsen SAMF ¶¶ 4, 30. CLRS Enterprises had purchased the assets of Woodward Thomsen, a business previously owned by Thomas Thomsen. Thomsen SAMF ¶¶ 2, 4. After the sale CLRS Enterprises continued to do business under the name "Woodward Thomsen," and Thomsen worked as an employee of CLRS. Defendants' SMF ¶¶ 3-4.

CLRS/Woodward Thomsen began experiencing significant financial difficulties in the summer of 2008 and eventually closed down that fall. Thomsen SAMF ¶ 13; Defendants' SMF ¶ 8. At that time, in attempting to satisfy its judgment, Maine Roofing sought to take possession of various trucks that it understood were assets of the CLRS/Woodward Thomsen enterprise. Defendants' SMF ¶ 12. Three trucks were missing, and Maine Roofing began efforts to locate the trucks. Specifically, Liz Darling repeatedly called Larry Chaney to ask him where the trucks were. Chaney originally responded that he did not know, but he ultimately stated to Liz Darling that Thomsen had the trucks. Asked why Thomsen had the trucks, Chaney responded that Thomsen "stole" them. Liz Darling Dep. 38-40, cited in Thomsen SAMF ¶ 61.[4]

---

[4] Thomsen attaches considerable significance to the fact that Liz Darling had repeatedly called Chaney. Although she may have been badgering Chaney to obtain the location of the trucks, there is no evidence that she was badgering or encouraging Chaney to accuse Thomsen. The only evidence in the summary judgment record is that Chaney, on his own initiative and without prompting by Liz Darling, decided to respond to Mrs. Darling's persistent inquiries by accusing Thomsen of stealing the trucks.

5

That led William Darling and his wife to encourage Chaney to report the trucks as stolen and to press the police and prosecutor's office to bring charges against Thomsen. E.g., Thomsen Ex. 33. When Chaney reported the trucks as stolen, both the police and the Darlings learned that the trucks had been re-registered in the name of "Woodward Thomsen Co. Inc." Chaney had not re-registered the trucks and reported that the Woodward Thomsen Co. Inc. name had been used by Thomsen before the sale of assets to CLRS Enterprises. Thomsen Ex. 16. Thomsen still maintained an old bank account under that name. Thomsen Aff. ¶ 24. This was considered by law enforcement personnel and the Darlings as evidence supporting Chaney's accusation that Thomsen had stolen the trucks. Thomsen Ex. 33.

Around the same time one of the vehicles was located parked on Danforth Street in Portland in the driveway of Marc Paulsen, a former employee of CLRS who Chaney and the Darlings believed was now working with Thomsen. Thomsen Ex. 33. This location was close to Thomsen's own residence. Id.; Thomsen Aff. ¶ 1.[5] Another of the trucks was found at Rowe Ford, where it had been dropped off by Thomsen. Thomsen Ex. 14, 34.

These facts were sufficient to provide William Darling and his wife with a reasonable belief that there was evidence to support a charge of theft against Thomsen. Probable cause has been defined to mean grounds sufficient to justify a man of ordinary prudence, not governed by passion or prejudice, in believing that a crime has been committed. Price v. Patterson, 606 A.2d 783, 785 (Me. 1992). It is not required that the belief be correct or even that the belief meet a preponderance of the evidence standard.

---

[5] Thomsen faults defendants for stating that the truck was found parked in a driveway two doors down from Thomsen's home rather than at Paulsen's residence. Thomsen SAMF ¶ 75, citing Thomsen Ex. 33. However, in the very next sentence of Thomsen Ex. 33, the Darlings state that a tenant in the home where the truck was found was a former employee of Woodward Thomsen Co. believed to be working for Thomsen.

State v. Bradley, 658 A.2d 236, 237-38 (Me. 1995). In this case probable cause is established by Larry Chaney's statement that Thomsen had stolen the trucks, by Thomsen's re-registration of the trucks, by the discovery of one truck on Danforth Street at the residence of an employee believed to be working with Thomsen, and by the discovery of a second truck at Rowe Ford, where it had been dropped off by Thomsen.

As it turned out, Larry Chaney's statement that Thomsen had stolen the trucks was false and there were innocent explanations for all the other information that led the Darlings and the police to believe Chaney's accusation. When the CLRS business began to experience financial difficulties, Thomsen had undertaken to finish some pending work under an arrangement with Chaney. Thomsen Dep. 37-42; Thomsen Aff. ¶ 24; Defendants' SMF ¶ 40.[6] When Thomsen re-registered the trucks under the name of Woodward Thomsen Co. Inc., he did so because the registration of the trucks had never been changed to CLRS Enterprises. Thomsen Aff. ¶ 24; Paulsen Aff. p. 4 (Thomsen Ex. 47).

Thomsen had taken one truck to Rowe Ford for repairs and simply left it there when CLRS Enterprises went out of business. Thomsen Ex. 14. As for the truck found in Marc Paulsen's driveway, Paulsen subsequently explained that he had been authorized to use the truck as part of his work for CLRS. When the company's offices were closed down, Paulsen had moved the truck to his driveway awaiting instructions from Larry Chaney – instructions which never came. Paulsen Aff. p. 5 (Thomsen Ex. 47). As far as Thomsen knew, the third remaining truck had been left at a CLRS jobsite in Standish when the company closed down, and Thomsen had heard that it might have been

---

[6] There is no evidence in the record that Chaney ever informed the Darlings or the police about this arrangement.

7

subsequently driven around by other former employees of CLRS/Woodward Thomsen. Thomsen Dep. 43-48. That truck was eventually recovered in Buxton.

Once those explanations were provided, the indictment against Thomsen was dismissed. Defendants' SMF ¶¶ 33-34; Thomsen SAMF ¶ 172. However, there is nothing in the record to indicate that any of those explanations were previously known to the Darlings. Thomsen strongly criticizes the investigation conducted by Portland Police Detective Richard Swift after Larry Chaney's report to the police. However, Thomsen has offered no evidence that the Darlings were responsible for Detective Swift's alleged failure to perform an adequate investigation. Nor is there any evidence that the Darlings were responsible for an additional statement Larry Chaney made that incriminated Thomsen.

Thus, when Chaney reported the alleged theft to the police, he told them that he believed "Thomsen and other employees took the vehicles" and went on to cast further suspicion on Thomsen by telling the police that the truck on Danforth Street was no longer there but Thomsen's personal vehicle was present, thus implying that Thomsen was driving the supposedly stolen truck. Thomsen Ex. 16.

Thereafter, Thomsen argues, Detective Swift focused on Thomsen and never interviewed other CLRS employees including Paulsen, at whose residence the first truck was found. Thomsen SAMF ¶ 91. Thomsen faults Detective Swift for reporting that Thomsen had essentially declined to be interviewed when Thomsen has testified that he told Swift everything he knew about the trucks and only terminated the interview when Swift became very accusatory. Thomsen SAMF ¶¶ 112-14; Thomsen Dep. 54-56. Thomsen also faults Detective Swift for failing to adequately investigate and discover

8

the actual facts behind Thomsen's registration of the vehicles and Thomsen's role in bringing one of the trucks to Rowe Ford.[7]

Indeed, Thomsen's opposition papers contain a litany of complaints about avenues of investigation which Swift left unexplored and questions Swift did not ask. See Thomsen SAMF ¶¶ 91-98; Plaintiff's Memorandum in Opposition to Summary Judgment dated June 7, 2013 at 18-21 & n.5. However, Thomsen's claim in this action is against the Darlings, and there is no evidence that the Darlings influenced the manner in which Swift conducted his investigation.

As noted above, there is evidence that the Darlings pressed Chaney to report the theft once Chaney stated that Thomsen had stolen the vehicles, and there is evidence that William Darling then spoke to acquaintances in the police and prosecutor's offices in an effort to have the charges pursued. Thomsen therefore argues that the investigation was "spurred" by the Darlings. As noted above, however, the record establishes that the Darlings had probable cause to believe that Thomsen had stolen the trucks. Subsequent failures by Detective Swift to uncover the exculpatory evidence that ultimately caused the charges to be dismissed did not retroactively deprive the Darlings of probable cause to initiate the police investigation.

Several other points should be made in this connection. First, Thomsen suggests that the Darlings were negligent in not conducting their own investigation and not communicating with Thomsen directly to ask about the trucks. However, neither law nor policy supports the proposition that citizens who have probable cause to report apparent criminal activity to the police are thereafter required to continue conducting a parallel investigation or to confront the persons they believe to have committed crimes.

_____

[7] Thomsen also suggests that there is evidence that Swift was not the most diligent investigator. Thomsen SAMF ¶¶ 101-02.

9

Indeed, it can strongly be argued that crime victims (and people who perceive themselves to be crime victims) should stand aside and let law enforcement officers do the investigating.

Second, the fact that an indictment was returned against Thomsen is evidence of probable cause. Restatement (Second) Torts § 664. Indeed, there is case law suggesting that an indictment is definitive evidence of probable cause, at least in the absence of the knowing presentation of false evidence. Gonzalez-Rucci v. Immigration and Naturalization Service, 405 F.3d 45, 49 (1st Cir. 2005). In this case Thomsen has offered no evidence that false evidence was knowingly presented.

Thomsen suggests that there is evidence that before the indictment was returned, information may have been withheld. He argues that William Darling did not tell the police that one of his employees spotted the third missing truck in Buxton in early 2010 and suggests that this might have been important to the prosecution decision. The first problem with this argument is that all the testimony that Thomsen relies on to suggest that the location of the third truck would have been considered by the prosecutor's office relates to the information available at the time of case intake, which occurred in early November 2009. Thomsen SAMF ¶ 159. At that time the third truck had not been spotted in Buxton. William Darling had informed the police in August 2009 that the third truck had been seen in Standish. Thomsen Ex. 36 p. 3. At that time this was all the information about the third truck that was available.

Thomsen has also not offered evidence that the Buxton information would have affected the decision to bring criminal charges, only speculation that it might have. Thomsen is entitled to all inferences that are fairly supported by the evidence but is not entitled to the benefit of inferences that are so speculative and conjectural that a jury would not be entitled to consider them. See Macone v. Town of Wakefield, 277 F.3d 1, 5,

10

7 (1st Cir. 2002). In any event, even if no weight is given to the indictment, the summary judgment record indicates that the Darlings had probable cause to initiate the criminal investigation as set forth above.

Finally, Thomsen argues that there is evidence that the Darlings bore some ill will against him and that this motivated their actions. The record support for some of Darling's arguments on this issue may be questioned.[8] Thomsen is correct that there is evidence that the Darlings did not like Thomsen, that they were angry at Thomsen and angry at what they perceived as his continued use of stolen vehicles under their noses, and that they wanted the police to investigate in order to assist them in satisfying their judgment from the trucks. This may well demonstrate that there is a triable issue as to whether the Darlings acted with malice for purposes of a malicious prosecution claim,[9] but it does not eliminate the existence of probable cause. See Restatement (Second) Torts § 662, comment b (lack of probable cause and proof of improper purpose must both be established; proof of one alone is not sufficient).

---

[8] At several points in his brief, Thomsen contends that William Darling's ill will toward Thomsen stemmed from Darling's belief that Thomsen had personally guaranteed some of CLRS's obligations. Plaintiff's June 7, 2013 Memorandum at 4, 10, citing Thomsen SAMF ¶¶ 20-23. If there is any evidence to support this assertion, it is not contained in the record references cited in Thomsen SAMF ¶¶ 20-23, which refer to statements made by Thomsen to various subcontractors that he would try to have Larry Chaney pay his bills but that Thomsen personally was not in a position to pay.

Thomsen also relies heavily on a statement in an email from Detective Swift to William Darling that a criminal charge or conviction "should give your attorney ammunition for a civil suit. That's where you go for your pay back." First, Swift made this statement, not Darling. Second, Swift's statement expressly refers to the recovery of money in civil proceedings, not the use of criminal charges to exact revenge. It bears emphasis that Thomsen's papers intermittently quote Swift's email omitting the space between "pay" and "back," thereby putting a more sinister cast on Swift's statement. See Plaintiff's June 7, 2013 memorandum at 9, 10; Thomsen SAMF ¶¶ 157-58 (all rendering the quoted words as "payback"). Quotations from the record should be faithful to the original text.

[9] For purposes of malicious prosecution, a plaintiff need only show that a defendant initiate criminal proceedings without probable cause and with a primary purpose other than that of bringing the offender to justice. Pepperell Trust Co. v. Mountain Heir Financial Corp., 1998 ME 46 ¶ 15 n.11, 708 A.2d 651, citing Restatement (Second) Torts § 653.

11

Because the summary judgment record demonstrates that the Darlings had probable cause to initiate a criminal investigation of Thomsen, they are entitled to summary judgment on Thomsen's claim of malicious prosecution.

Defamation

The elements of a claim of defamation are (1) a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. E.g., Lester v. Powers, 596 A.2d 65, 69 (Me. 1991), quoting Restatement (Second) Torts § 558.

On the instant motion the Darlings argue that the statements made by the Darlings to law enforcement authorities were privileged and they challenge whether there is sufficient evidence to generate a factual dispute for trial as to whether any of the other statements complained of by Thomsen were false and defamatory.

In order to evaluate these arguments it is necessary to examine the specific statements that form the basis for Thomsen's defamation claims. In response to defendants' motion, Thomsen has pointed to the following:

(1) a March 29, 2009 email from Liz Darling to Larry Chaney stating, "I am sorry for your hardship. Bill and I both know it stems from Tom Thomsen."

(2) the contention that William Darling made various defamatory statements to Assistant District Attorney Robert Ellis in a phone conversation on May 1, 2009.

12

(3) the contention that William Darling made defamatory statements about Thomsen to his brother David Darling sometime prior to August 24, 2009; and

(4) the contention that at some point William Darling made defamatory statements about Thomsen to one of his employees, William Clark.

Plaintiffs' Memorandum in Opposition to Summary Judgment dated June 7, 2013 at 23-24.[10]

1. The March 29, 2009 Liz Darling email

The relevant text of Liz Darling's March 29, 2009 email to Larry Chaney is as follows:

> I truly am sorry for your hardship. Bill and I both know it stems from Tom Thomsen. What comes around will eventually go around . . . sometimes we just wish it were sooner rather than later.

Thomsen Ex. 15.

On its face this email does not suggest or imply that Thomsen committed any crime but it either constitutes Liz Darling's agreement with Chaney's accusation against Thomsen or constitutes a statement that Thomsen is responsible for Chaney's financial problems. To the extent that her statement could be construed as a statement of opinion, it suggests that there are facts to support the opinion. Restatement (Second) Torts § 566.

---

[10] Thomsen argues in passing that based on William Darling's conversation with ADA Ellis, an inference can be drawn that William Darling made other defamatory statements to other unspecified persons. Id. This ignores the rule that in defamation cases, the words used and the specific circumstances (which relate to whether a privilege applies) are crucial. A plaintiff need not prove the exact words used but must prove the defamatory statement and the surrounding circumstances with some specificity. Picard v. Brennan, 307 A.2d 833, 834-35 (Me. 1973). Thomsen cannot rely on speculative inferences that William Darling might have made unspecified defamatory statements on unspecified other occasions.

Whether Maine Roofing is liable for defamation based on this email is an issue to be resolved at trial. There may be a question whether Thomsen suffered any damages as a result of a statement that was made to Chaney, who had previously accused Thomsen of theft, and that was apparently not further publicized. That has not, however, been raised on the motion for summary judgment.

2. William Darling phone conversation with ADA Ellis

This conversation is a significant element of Thomsen's defamation claim. There is no direct evidence in the summary judgment record of what Darling said to Ellis, with whom he was acquainted through South Portland high school sports. However, Ellis's subsequent email and his deposition testimony are evidence that Darling at least made statements to the effect that Thomsen had ripped him off. This is an imputation of criminal conduct and defamatory if false.

A threshold question as to Thomsen's defamation claims conversation is whether a conditional privilege would apply. Whether a conditional privilege exists is an issue of law. Morgan v. Kooistra, 2008 ME 26 ¶ 32, 941 A.2d 447. Reporting potential crimes to law enforcement officials would clearly fall within a conditional privilege. See Restatement (Second) Torts § 598. Darling's phone call to Ellis was thus subject to a conditional privilege.

A conditional privilege may be lost if the privilege was abused. A conditional privilege is abused if defamatory statements that would otherwise be privileged are made by someone who knows those statements to be false or who recklessly disregards the truth or falsity of the statements. Rice v. Alley, 2002 ME 43 ¶ 23, 791 A.2d 932. Reckless disregard can be shown by evidence that the maker of the statement had a

14

high degree of awareness of probable falsity or serious doubt as to the truth of the statement. Cole v. Chandler, 2000 ME 104 ¶ 7, 752 A.2d 1189. Inadequate investigation as to the truth of the statement is not sufficient to show reckless disregard. Rice v. Alley, 2002 ME 43 ¶ 23.

In this case the same evidence that establishes that the Darlings had probable cause to initiate a criminal investigation[11] is sufficient to establish for purposes of summary judgment that William Darling had a basis for his statements to Ellis, that he did not know those statements to be false, and that he was not recklessly disregarding the truth or falsity of those statements. Indeed, there is no evidence suggesting that Darling either knew his statements to Ellis were false or that Darling had a high degree of awareness of their falsity or serious doubt as to their truth.

A conditional privilege may also be abused if the person making the communication acts "solely out of spite or ill will." Lester v. Powers, 596 A.2d 65, 70-71 (Me. 1991) (emphasis in original). As Lester v. Powers demonstrates, the dispositive question in this connection is whether the communication in question was made for the purpose for which the privilege has been given. If so, "the fact that the publication is inspired in part by resentment or indignation at the supposed misconduct of the person defamed does not constitute an abuse of the privilege." Id., quoting Restatement (Second) Torts § 603 comment a.

In this case, the record suggests that William Darling's call to ADA Ellis resulted from frustration at what appeared to be the slow pace of the police investigation. See Thomsen Ex. 56. Pressing for action on the part of law enforcement authorities would be within the scope of a conditional privilege. The record also suggests that William

---

[11] The only information discussed at pp. 5-6 above that was not available at the time of Darling's May 1, 2009 phone call to Ellis was the information that Thomsen had dropped off one of the trucks at Rowe Ford.

15

Darling may have independently disliked Thomsen. Id. (Ellis email recounting conversation with William Darling – "sees this guy every day and has no stomach for him"). Given that Darling had probable cause to believe that Thomsen had wrongfully taken the trucks, however, this is insufficient to raise a disputed issue for trial as to whether Darling was acting "solely" out of ill will that was unconnected with his unhappiness at what he believed was criminal conduct on Thomsen's part.

Nevertheless, there is a question in this case whether Darling's call to ADA Ellis was outside the scope of the privilege to report suspected criminal activity to law enforcement officials. A conditional privilege may be abused if the communication is made to a person outside the group to whom the privilege would apply. Restatement (Second) Torts § 604. Thomsen argues that ADA Ellis was not acting in his official capacity during his conversation with William Darling because ADA Ellis was not assigned to Portland cases.[12]

In this connection there is language in a number of Law Court decisions stating that a conditional privilege may be abused if the communication is made "outside normal channels." Rice v. Alley, 2002 ME 43 ¶ 23.[13] As far as the court can tell, that language was first used in Gautschi v. Maisel, 565 A.2d 1009, 1011 (Me. 1989), as part of a recitation of the general principles relating to the abuse of a conditional privilege. The only decision cited in Gautschi that contains the phrase "outside normal channels" is Greenya v. George Washington University, 512 F.2d 556, 563 (D.C. Cir. 1975), which also used the term as part of a summary of the applicable law.

---

[12] The court would not find that the conversation was unprivileged just because Darling and Ellis were acquaintances. A citizen who reports potential criminal activity to a law enforcement official whom the citizen is acquainted and with whom the citizen is friendly is nevertheless entitled to claim a conditional privilege.

[13] See also Morgan v. Kooistra, 2008 ME 26 ¶ 31; Cole v. Chandler, 2000 ME 104 ¶ 7.

16

Greenya appears to rely on Prosser's treatise for its reference to "outside normal channels."[14] The court does not have access to the edition of the Prosser treatise that is cited in Greenya, but the current edition of the Prosser treatise does not use the "outside normal channels" language. It does suggest that the privilege is lost if communications are made to persons who have no reason to receive the information. Prosser, Law of Torts § 115 (5th ed. 1984) at 832.

This is consistent with the Restatement's focus on whether a communication is made for the purpose for which the privilege is given and whether it is made to persons reasonably believed to be appropriate recipients to further the public interest justifying the privilege. Restatement (Second) Torts §§ 603-04. It is also consistent with the only Law Court cases that have addressed communications allegedly made outside normal channels.

Thus in Lester v. Powers, the Law Court expressly declined to adopt a "technical" interpretation of whether a communication was made outside normal channels. 596 A.2d at 70. And in Cole v. Chandler, the Law Court found no abuse of a conditional privilege even though it appeared that the individuals who had allegedly defamed the plaintiff did not follow proper company procedures for reporting a harassment claim. 2000 ME 104 ¶ 8.

The appropriate inquiry, therefore, is whether William Darling was acting in furtherance of an interest in seeking to have potential criminal wrongdoing pursued or whether his conversation with ADA Ellis was not intended to further that interest. As a matter of policy, the court would be hesitant to rule that citizens who report potential crimes to law enforcement officials or who urge law enforcement officials to pursue potential wrongdoing expose themselves to an increased risk of liability if they reach

---

[14] 512 F.2d at 563 n.15., citing Prosser, Law of Torts § 115 (4th ed. 1971) at 791.

17

out to officials who are not directly involved in an investigation. Nevertheless, on this record the court cannot find that it is undisputed that William Darling's call to ADA Ellis was in furtherance of an interest to have the criminal charges investigated. Summary judgment cannot be granted on this issue.

### 3. William Darling Statements to David Darling

Standing alone, there is no admissible evidence that William Darling made defamatory statements to his brother David Darling. Thomsen's testimony – that David Darling told Thomsen that William Darling had stated to David Darling that Thomsen had William Darling's trucks and owed William Darling money[15] – is hearsay. Plaintiff's counsel has submitted an affidavit on this issue, but that affidavit only serves to demonstrate counsel's recognition of the hearsay nature of Thomsen's evidence on this issue. See Hambley Aff. ¶¶ 4-9.

However, because summary judgment is being denied on other aspects of the defamation claim, Thomsen may at trial seek to elicit testimony as to alleged defamatory statements made by William Darling to his brother.

### 4. William Darling Statements to William Clark

William Clark is an employee of Maine Roofing who was asked if he had spotted any of the missing trucks. Thomsen contends that Clark was told by Darling that Thomsen "owed some money and . . . had some trucks." Plaintiff's June 7, 2013 Memorandum at 24 (quotation in original); Thomsen SAMF ¶ 135. This is a misstatement of the record. Clark's actual testimony is that he was told, "Tom had

---

[15] Thomsen SAMF ¶ 104.

18

owed some money and Billy had some trucks – awarded trucks." Clark Dep. 6 (emphasis added).[16] "Billy" refers to William Darling, who had obtained a judgment lien on the trucks on behalf of Maine Roofing.

In his deposition Clark directly denied that he had ever heard the Darlings say anything disparaging about Thomsen or that he had ever heard them say that Thomsen had stolen any trucks. Clark Dep. 14-15. Thomsen is not entitled to pursue defamation claims based on unsubstantiated statements supposedly made to William Clark.

Punitive Damages

The Darlings' motion also seeks summary judgment on Thomsen's claim for punitive damages.[17] The Law Court has held that in appropriate cases summary judgment may be granted dismissing punitive damage claims if the court concludes that the alleged conduct does not meet the applicable requirements for such claims as matter of law. E.g., Gayer v. Bath Iron Works, 687 A.2d 617, 622 (Me. 1996). Indeed, in a case where – as on summary judgment – the facts had to be construed in the light most favorable to the plaintiff, the Law Court ruled that even fraudulent conduct that may be worthy of condemnation does not rise to the level of outrageousness justifying punitive damages. Boivin v. Jones & Vining, Inc., 578 A.2d 187, 189 (Me. 1990).

In this case, where the factual record establishes that the Darlings had probable cause to suspect Thomsen of stealing the trucks – however inaccurate that suspicion turned out to be – the court concludes that Thomsen has not offered any evidence that

---

[16] As stated earlier, when pleadings and legal memoranda purport to be quoting from the record, those quotations should be faithful to the original testimony.

[17] Thomsen's complaint originally sought his attorneys fees in pursuing this action, but he has since acknowledged that his fees in this case are not recoverable under the American rule absent misconduct during the course of the litigation. Plaintiff's June 7, 2013 Memorandum at 26.

would raise an issue for trial as to whether their conduct was so motivated by malice or ill will or otherwise was so outrageous that a jury could award punitive damages by clear and convincing evidence.

The entry shall be:

Defendants' motion for summary judgment is granted with respect to plaintiff's malicious prosecution claim and with respect to plaintiff's claim for punitive damages and is denied as to plaintiff's defamation claims. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: October 24, 2013

Thomas D. Warren
Justice, Superior Court

20

--------------------------------------------------------------------------------

| 01 0000003655 | CARY, PETER | | | |
|---|---|---|---|---|
| 85 EXHANGE ST 4TH FLOOR PORTLAND ME 04101-5036 | | | | |
| F | LARRY CHANEY | DEF | RTND | 03/29/2011 |

| 02 0000002593 | DINAN, CHRISTOPHER | | | |
|---|---|---|---|---|
| 95 EXCHANGE ST PO BOX 7046 PORTLAND ME 04112-7046 | | | | |
| F | WILLIAM DARLING | DEF | RTND | 04/11/2011 |
| F | MAINE ROOFING INC | DEF | RTND | 04/11/2011 |

| 03 0000001139 | HAMBLEY, CLARKE C | | | |
|---|---|---|---|---|
| 75 PEARL STREET SUITE 214 PORTLAND ME 04101 | | | | |
| F | THOMAS THOMSEN | PL | RTND | 02/18/2011 |